[Doc. No. 18]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| SHELLY MARTIN, et al., | |
| Plaintiffs, | |
| v. | Civil No. 10-6793 (JHR/JS) |
| ATLANTICARE, et al., | |
| Defendants. | |

**OPINION**

After Lisa Grosskruetz, Esquire, did substantial substantive defense work on this case while employed by defendants' law firm, Morgan, Lewis and Bockius, LLP ("Morgan"), she left Morgan and went to work for plaintiffs' law firm, Costello & Mains, P.C. The question before the Court is whether Costello & Mains should be disqualified because it employed a side-switching attorney.[1] Under the circumstances presented herein the answer is an emphatic yes. Accordingly, defendants' Motion to Disqualify Plaintiffs' Counsel is GRANTED.

---

[1] "A side-switching attorney is one who formerly represented a client in a matter and subsequently undertakes representation, or affiliates herself with a firm that has undertaken representation, of an adversary in a related matter." Pallon v. Roggio, Civ. Nos. 04-3625 (JAP), 06-1068 (FLW), 2006 WL 2466854, at *4 (D.N.J. Aug. 24, 2006).

**Discussion**

**Fact Background**

Plaintiffs Shelly Martin ("Martin"), Karla Mayfield and Donna Davis filed this lawsuit on October 28, 2010 in the Superior Court of New Jersey.  The case was removed to federal court on December 28, 2010.  All plaintiffs allege, <u>inter</u> <u>alia</u>, that defendants discriminated and retaliated against them because of their race and ethnicity.[2]  Plaintiff Martin also alleges that her employer, ARMC, violated the New Jersey Wage and Hour Law and the Fair Labor Standards Act by not paying her for work in excess of forty hours per week.  Martin brings this claim on behalf of herself and as a "collective action" on behalf of similarly situated workers.

Plaintiffs are represented by Costello & Mains ("CM").  The managing partner of the firm is Kevin Costello ("Costello" or "KC").  Defendants are represented by Morgan.  As noted, the side-switching attorney at issue is Lisa Grosskruetz ("LG").  At the inception of the case, defendants' defense was coordinated by a three-attorney team at Morgan.  The supervising partner-in-charge was Richard Rosenblatt, Esquire ("RR").  The other attorneys on the original defense team were LG and Prashanth Jayachandran, Esquire, ("PJ").  LG started working for Morgan on November 22, 2010 after having litigated employment matters in New Jersey for 23 years.  PJ has been admitted to practice for 12 years and has extensive

---

[2]The defendants are AtlantiCare Regional Medical Center ("ARMC"), Caroline Baier and Rose Uhland.  The defendants will be collectively referred to as AtlantiCare.

experience representing employers in wage and hour class and collective actions.

According to her time records LG started working on this case for Morgan on November 24, 2010.  LG left Morgan on March 4, 2011.[3] During the approximately 4½ months she was employed at Morgan LG worked 108.2 hours on the case.  During the same time period RR worked only 13.1 hours on the case and PJ worked 49.6 hours.  See PJ Declaration ¶3.  This motion to disqualify arises from the fact that after LG left Morgan on March 4, 2011, she started working for CM on March 7, 2011.[4]  See LG Declaration ¶1.  LG subsequently left CM on April 15, 2011 and is no longer working for the firm.[5] Defendants were not notified of LG's side-switching before LG started working at CM.  Defendants first learned that their former defense counsel was employed at their adversary's law firm when PJ noticed LG's name on CM's letterhead.

The parties do not dispute that LG is disqualified from representing plaintiffs pursuant to New Jersey Rule of Professional

_____

[3] Although LG alleges she left Morgan on March 4, 2011 (see LG Declaration ¶1), defendants allege she left on March 1, 2011.  See PJ Declaration ¶9.  This discrepancy is not material to the Court's decision.

[4]Defendants do not allege that LG worked on the case while she was employed by CM.  Defendants also do not allege that LG revealed any privileged information or client confidences to CM.

[5]While LG was working for Morgan, Costello initiated the discussions about her coming to work for him.  See Transcript ("Tr.") of July 18, 2011 Oral Argument 24:6-10.  During the call Costello learned that LG was apparently dissatisfied with her work at Morgan.  Id. 36:2-19.

Conduct ("RPC") 1.9. Defendants argue that since LG is disqualified from representing plaintiffs, the disqualification should be imputed to CM pursuant to RPC 1.10.  Defendants argue LG had "primary responsibility" for the defense of this matter while she was employed at Morgan and therefore she cannot be adequately screened.  Defendants also argue that even if LG did not have primary responsibility CM still must be disqualified because LG was not adequately screened.  In addition, defendants argue disqualification is appropriate because they did not receive timely written notice of LG's side-switching.  Plaintiffs dispute that LG had primary responsibility for defendants' defense while she worked at Morgan.  Plaintiffs also argue LG was adequately screened and that defendants received timely notice of LG's side-switching.

**Motions to Disqualify**

In the District of New Jersey, issues regarding professional ethics are governed by L. Civ. R. 103. 1(a).  This Rule provides that the Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of members of the bar admitted to practice in the District. <u>See</u> L. Civ. R. 103.1(a); <u>Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav., FSB</u>, 944 F.Supp. 341, 344-45 (D.N.J. 1996).  When deciding a motion to disqualify counsel the movant bears the burden of proof that disqualification is appropriate.  <u>City of Atlantic City v. Trupos ("Trupos")</u>, 201 N.J. 447, 462-63 (2010); <u>Maldonado v. New Jersey, ex rel.</u>, 225 F.R.D. 120, 136-37 (D.N.J.

4

2004).  The movant's burden is a heavy one since "[m]otions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'"  Alexander v. Primerica Holdings, Inc., 822 F.Supp. 1099, 1114 (D.N.J. 1993) (quoting Schiessle v. Stephens, 117 F.2d 417, 420 (7th Cir. 1983) (internal quotation marks and citation omitted)).  Nevertheless, "a motion for disqualification calls for [courts] to balance competing interests, weighing the need to maintain the highest standards of the profession against a client's right freely to choose his counsel."  Trupos, 201 N.J. at 462 (citing Dewey v. R. J. Reynolds Tobacco Co., 109 N.J. 201, 218 (1988).  In weighing this balance the Court is mindful that "there is no right to demand to be represented by an attorney [or law firm] disqualified because of an ethical requirement."  Id.

When determining whether to disqualify counsel the Court must closely and carefully scrutinize the facts to prevent unjust results.  Montgomery Acad. v. Kohn, 50 F.Supp.2d 344, 349 (D.N.J. 1999).  In Steel v. Gen. Motors Corp., 912 F.Supp. 724, 733 (D.N.J. 1995) (citation omitted), the court noted that its balancing "involves a 'painstaking analysis of the facts and precise application of precedent.'"  Id.  In addition, "[t]he decision whether to disqualify a law firm by imputation is best undertaken on a case-by-case basis, weighing the facts as they exist at the time the motion to disqualify is made.  New Jersey courts have

5

consistently eschewed per se rules of disqualification, stressing the 'fact-sensitive nature' of a decision to disqualify counsel." <u>Cardona v. Gen. Motors Corp.</u>, 942 F.Supp. 968, 976 (D.N.J. 1996).

Since disqualification issues are intensely fact-specific, it is essential to approach such issues with a sense of practicality as well as a precise understanding of the underlying facts. <u>Murphy v. Simmons</u>, Civ. No. 06-1535 (WHW), 2008 WL 65174, at *5 (D.N.J. Jan. 3, 2008)(citation and quotation omitted). Accordingly, the Court scrutinized the parties' detailed submissions and is deciding defendants' motion based on the extensive written record and oral argument.[6]  The record includes the Declarations of Rosenblatt, Jayachandran, and Donna Michael-Ziereis, Esquire (defendants' Associate General Counsel).  The record also includes the Certifications of Grosskreutz, Costello and Deborah L. Mains, Esquire.  In addition, the Court reviewed <u>in camera</u> Morgan's bills from November 22, 2010 to February 28, 2011, which include each timekeeper's contemporaneous descriptions of his or her work.  The Court also reviewed <u>in camera</u> a representative sample of LG's privileged e-mails while she worked at Morgan.

In order to decide defendants' motion it was not necessary to hold a formal evidentiary hearing or to hear LG's live testimony. New Jersey case law is quite clear that a motion to disqualify should ordinarily be decided on the basis of affidavits and

---

[6]Oral argument was held on July 18, 2011 [Doc. No. 35] and September 15, 2011 [Doc. No. 45].  The transcripts are available on the court's docket.

6

documentary evidence except where "the court cannot with confidence decide the issue on the basis of the information contained in those papers...." Dewey, 109 N.J. 201, 222 (1988).  In Dewey the Court also noted that "a hearing should be held only when it is indispensable to resolution of the [disqualification] issue." Id. This is necessary to protect against the revelation of client confidences which the RPC's are designed to protect.  Id. at 222-23.  Given the detailed record, the Court determined that live testimony was not necessary.

**RPC 1.9 and 1.10(c)**

RPC 1.10(c) provides the framework for deciding defendants' motion.[7]  This RPC reads:

> (c) When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under RPC 1.9 unless,
>
> (1) the matter does not involve a proceeding in which the personally disqualified lawyer had primary responsibility;
>
> (2) the personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
>
> (3) written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.

As RPC 1.10(c) dictates, the Court must first determine whether LG is disqualified under RPC 1.9, which governs duties to former clients.  RPC 1.9 provides:

---

[7]The "appearance of impropriety" is not germane to the Court's conflict analysis as this factor was eliminated in the 2004 amendments to the RPC's. Trupos, 201 N.J. at 464.

7

> (a) A lawyer who has represented a client in a
> matter shall not thereafter represent another
> client in the same or a substantially related
> matter in which that client's interests are
> materially adverse to the interests of the former
> client unless the former client gives informed
> consent confirmed in writing.
>
> (b) A lawyer shall not knowingly represent a person
> in the same or a substantially related matter in
> which a firm with which the lawyer formerly was
> associated had previously represented a client, (1)
> whose interests are materially adverse to that
> person; and
>
> (2) about whom the lawyer, while at the former
> firm, had personally acquired information protected
> by RPC 1.6 and RPC 1.9(c) that is material to the
> matter unless the former client gives informed
> consent, confirmed in writing.

As has previously been discussed, LG joined CM immediately after leaving Morgan where she worked on the defense of the present case. Although plaintiffs minimize LG's role while at Morgan, they acknowledge that LG is disqualified from working on the case pursuant to RPC 1.9(a) and (b).

Having determined that LG is disqualified from representing plaintiffs pursuant to RPC 1.9, the pertinent issue becomes whether LG's disqualification is imputed to CM. To make this determination the Court must assess the three elements of RPC 1.10(c). First, whether LG had primary responsibility for the case while she worked at Morgan. Second, whether LG was adequately screened upon joining CM. Third, whether timely notice was provided to defendants of LG's side switching. The Court must conduct a "painstaking analysis of the facts" as to each of these elements. See Dewey, 109 N.J. at 205 (citation and quotation

8

omitted).

**"Primary Responsibility"**

The focus of the parties' arguments centers on whether LG had primary responsibility for the defense of the litigation while she was employed at Morgan.  Primary responsibility is defined in the "terminology" section of the RPC's as "actual participation in the management and direction of the matter at the policy-making level or responsibility at the operational level as manifested by the continuous day-to-day responsibility for litigation or transaction decisions." RPC 1.0(h).  Since "surmise alone" cannot support disqualification, Trupos, 201 N.J. at 469, the evidence will be closely analyzed to determine if LG had primary responsibility.

If the Court determines that LG had "primary responsibility" while at Morgan its inquiry is complete and defendants' motion must be granted.  Pursuant to RPC 1.10(c)(1), an attorney with primary responsibility cannot be screened at her new firm. See In re Gabapentin Patent Litigation ("Gabapentin"), 407 F.Supp.2d 607, 611 (D.N.J. 2005)(screening of individual attorneys from involvement in a case at the firm was insufficient alone to overcome the imputed disqualification, where the individuals had primary responsibility in the same matter while acting as counsel for the opposing party).

The 2004 amendments to the RPC's, which added a screening option to RPC 1.10, "constitute[d] a major change in New Jersey's approach to the question of imputed disqualification in the context of representation adverse to a former client."  Kevin H. Michels,

9

<u>New Jersey Attorney Ethics: The Law of New Jersey Lawyering</u>, §
24:3-1 at 583 (2010)(hereinafter "Michels").   Pursuant to the
present version of RPC 1.10:

> an attorney who worked on the matter while at the prior firm,
> but who did not have "primary responsibility," can be screened
> from the matter after switching to the new firm....  If the
> attorney had primary responsibility for the matter before
> switching firms, however, screening would not cure the imputed
> conflict.[8]

<u>Id.</u>

If LG did not have primary responsibility, the Court must then
analyze RPC 1.10(c)(2)and (3).  If LG was adequately screened and
is not apportioned a fee from the case, and if adequate written
notice was given to her affected former client, e.g., AtlantiCare,
then defendants' motion should be denied.[9]   <u>See</u> Michels, <u>supra</u>
("The attorney's limited, peripheral involvement with the adverse
party before switching firms would not prevent the new firm from
continuing in the matter if the attorney were properly screened").[10]

---

[8]The ABA's Model Rules of Professional Responsibility ("MRPC")
do not contain a screening provision in RPC 1.10(c).  An amendment
to Model Rule 1.10 that would have approved screening in additional
contexts was proposed and rejected in 2001. <u>ABA/BNA Lawyer's Manual
on Professional Conduct</u>, 17 <u>Current Reports</u> 492, 494 (Aug. 15,
2011). Nevada and Indiana adopted RPC's that mirror New Jersey's
rule using the term "primary responsibility."  <u>See</u> Nev. R. Prof'l
Conduct 1.10(e)(1); Ind. R. Prof'l Conduct 1.10(c)(1).

[9]Since defendants do not allege that LG was apportioned an
improper fee, the fee issue will not be addressed herein.

[10]Because of the change in the RPC's, the viability of the
following quote in <u>Dewey</u>, 109 N.J. at 220, is doubtful as
applicable to the imputed disqualification issue:

> We cannot conceive of any situation in which the side-
> switching attorney or his new firm would be permitted to
> continue representation if, unlike the situation before us,

Plaintiffs and LG minimize LG's role while at Morgan.  LG alleges she "was assigned to perform certain limited tasks with regard to this matter."  LG Certification ¶1 ("LG Cert.").  Plaintiffs argue, "the work Ms. Grosskreutz performed while an associate at Morgan Lewis concerned nothing more than review of mostly irrelevant and/or discoverable documents and interviews of witnesses that elicited discoverable information."  Brief in Opposition ("Opp. Brief") at 8.  See also Supplemental Brief in Opposition ("Supp. Brief") at 9.

Defendants present a drastically different view of LG's role.  Defendants argue, "Ms. Grosskreutz was an integral part of the defense team and she was 'intimately involved in defendants' legal strategy.'" Memorandum of Law in Support of Defendants' Motion ("Memo. of Law") at 1.  Defendants further argue, "Ms. Grosskreutz' hours were spent receiving and analyzing privileged and confidential information, being privy to defendants' litigation strategy, and assisting in tactical development of Defendants' defense."  Id. at 10.   In addition, defendants argue, "Ms. Grosskreutz was an important member of the defense team.  She had primary responsibility because (1) she worked more than any other lawyers on this matter combined during the initial investigating and pleadings phase and (2) she was privy to confidential work product material during her representation of Defendants."  Reply

---

the attorney had in fact actually represented the former client or had acquired confidential information concerning the client's affairs. (Emphasis in original).

Memorandum of Law in Support of Defendants' Motion to Disqualify ("Reply Memo.") at 4.

Plaintiff's characterization of LG's role at Morgan as "limited" does not comport with the evidence. This is illustrated by the fact that from November 2010 to March 2011 LG worked 108.2 hours on the case, almost twice as many hours as the combined total of the other two members of the Morgan defense team. Further, LG's Certification supports defendants' argument that she played an integral role while at Morgan. LG acknowledges that she prepared all or part of defendants' removal papers and motion to dismiss, reviewed client documents for relevancy, consulted with defendants' in-house counsel, prepared witness outlines, interviewed defendants' witnesses, prepared witness summaries, and spoke with plaintiffs' counsel. LG's contemporaneous time billing entries also contradict her allegation that she only performed "limited tasks." LG Cert. ¶1. According to her billing entries LG researched relevant legal issues, prepared legal papers, analyzed plaintiffs' complaints, reviewed background investigation materials about plaintiffs provided by the client, exchanged e-mails with the client, reviewed client documents, prepared representation letters, analyzed plaintiffs' discovery directed to defendants, reviewed and analyzed plaintiffs' personnel files with regard to the defense of their discrimination claims, prepared witness outlines, interviewed witnesses, prepared witness summaries, communicated with her clients about plaintiffs, and identified relevant and responsive

documents.  These are hardly "limited" roles.  LG's descriptions evidence that she played a substantial and substantive role in AtlantiCare's defense.

Defendants' Declarations provide further evidence of LG's integral defense role.  RR provided Morgan's strategic leadership. RR Declaration ¶5.  RR alleges that LG was "intimately involved in every facet of the defense" (id. ¶6) and that she "took an active operational role in almost all aspects of [Morgan's] defense of this matter" (id. ¶7).  RR also states that the Morgan team would "make collaborative decisions as to how to address issues arising in the case" (id. ¶6).  In addition, RR stated that LG would make recommendations for how to proceed with AtlantiCare's defense (id.) and he would brief LG on his communications with the client (id. ¶9).  RR's staffing plan was for LG and PJ "to share primary responsibility for the day-to-day operational management of the case with [his] oversight and direction as needed."  Id. ¶4.  RR expected that eventually LG "would assume virtually the sole day-to-day lead operational role" by the time PJ became fully involved in another case pending in Boston.  Id.  RR explained that given LG's experience "the staffing plan was to have [LG] handle the bulk of the day-to-day case handling."  Id.

AtlantiCare's in-house counsel corroborates Morgan's Declarations.  She swore:

> Lisa Grosskreutz, a former Morgan Lewis associate, was actively representing AtlantiCare and the individual defendants in this case during her tenure at Morgan Lewis.  We sent volumes of

> documents and materials to Morgan Lewis related to
> the case, which Ms. Grosskreutz reviewed.   Ms.
> Grosskreutz also interviewed several witnesses.
> She communicated with me regarding her witness
> interviews and her review of documents related to
> this case.   I also spoke with Ms. Grosskreutz
> regarding our legal strategy and our internal
> efforts to collect relevant documents.   In
> addition, Ms. Grosskreutz is aware of AtlantiCare's
> investigation into matters raised by the Complaint.

Declaration of Donna Michael-Ziereis, Esquire ¶3.

LG's e-mails also evidence her integral defense role.  The e-mails demonstrate that the Morgan defense team and AtlantiCare regularly communicated about the status of the case and defense strategies.   The e-mails also demonstrate that LG was privy to information protected by the attorney-client privilege and work-product doctrine.   In addition, the e-mails show that LG provided her strategic input on different employment related issues.

The foregoing evidence demonstrates to the Court that LG's actions fit squarely within the meaning of the term "primary responsibility" as the term is defined in the RPC's.   In order to have primary responsibility it was not necessary for LG to be the supervising attorney on the file or the partner in charge of the file.  This is evident by the fact that the applicable definition merely requires "participation" in the "management and direction of the matter at the policy-making level."   LG plainly "participated" in the management of the case as she took the "laboring oar" in AtlantiCare's defense and she regularly consulted with the Morgan defense team about defense strategy.   Further, as PJ was "out of pocket" in February 2011, and RR's role at the time was minimal, LG

14

was essentially responsible for AtlantiCare's entire defense before she left Morgan.  LG also had "responsibility at the operational level" as manifested by the "continuous day-to-day responsibility for litigation or transaction decisions."  This is evidenced by LG's regular and continuous work on the file from when she started at Morgan to when she left.  Given the breadth of her work and the number of hours she worked on the case, it cannot be reasonably challenged that LG had operational and decisional responsibilities.  The Court finds that LG had "primary responsibility" even though she was not the "supervising attorney" on the file and even though she shared defense responsibility with her colleagues.

The term "primary responsibility" has not been extensively addressed in the case law.  Nonetheless, the decision in <u>United States of America v. Pelle</u>, No. CRIM. 05-407 (JBS), 2007 WL 674723 (D.N.J. Feb. 28, 2007), discusses the issue in detail.[11]  In <u>Pelle</u>, the defendant sought to substitute new counsel, United Defense

---

[11]Although the decision in <u>Gabapentin</u>, <u>supra</u>, is relevant, it is not, as defendants argue, controlling.  That case primarily addressed whether different clients in a joint defense group waived a conflict.  Waiver is not an issue in this case.  Unlike this Opinion, <u>Gabapentin</u> did not specifically analyze whether the side-switching attorneys had primary responsibility within the meaning of RPC 1.10(c)(1).  For purposes of its waiver analysis the Court assumed the attorneys had such responsibility because they were "fully engaged in and primarily responsible for the pretrial representation of [their client], and in the course thereof, were privy to confidential attorney work-product and privileged information...."  407 F. Supp. 2d at 609.  Nevertheless, the decision is persuasive because the disqualified attorneys in <u>Gabapentin</u> did similar work to LG, e.g., they collected testimonial and documentary evidence, analyzed legal issues in prepartion for dispositive motions, participated in defense meetings, and established and executed defense strategy.  <u>See</u> <u>id</u>.

Group ("UDG") of Studio City, CA, to represent him over the objections of the United States.  Before they joined UDG, two UDG attorneys, Lorilee and Angelyn Gates, represented "CW", a confidential witness who was expected to testify against Pelle at trial.  This representation occurred while Lorilee and Angelyn were employed by CW's law firm, Criminal Defense Associates ("CDA") of Woodland, CA.  The issue presented was whether the conflict that prevented Lorilee and Angelyn from representing Pelle was imputed to the UDG law firm pursuant to RPC 1.10(c).

The evidence in <u>Pelle</u> demonstrated that after CW was arrested, Lorilee traveled to New Jersey for CW's detention hearing and spoke with CW for 30 minutes to prepare for the hearing.  At the hearing CW was released on conditions of bail.  Thereafter, CW and Lorilee had no contact.  While at CDA, Angelyn made telephone calls to gather preliminary information. She was not sure if she spoke with CW.  Neither Lorilee or Angelyn worked on Pelle's defense after they left UDG to work at CDG.  After Lorilee and Angelyn left UDG to work for CDG, CW pleaded guilty to a conspiracy pursuant to 18 U.S.C. §2423(e) and named Pelle as his co-conspirator.  CW was expected to testify as a material witness for the government in the case against Pelle.  Pelle's proposed new trial counsel at UDG averred that he never spoke with Lorilee and Angelyn about the Pelle case or their representation of CW.  UDG argued that despite employing CW's former attorneys, they could represent Pelle if the attorneys were screened from any participation in Pelle's defense.

The United States objected to the representation.

As an initial matter, the court ruled that Lorilee and Angelyn should be disqualified from representing Pelle. Id. at *4. The Court then examined whether the disqualification was imputed to CDG pursuant to RPC 1.10. In this regard the Court focused on whether Lorilee and Angelyn had "primary responsibility" for defending CW. The court defined the term as follows:

> The term "primary responsibility" in RPC 1.10(c) is not self-defining. It includes the attorney who has sole responsibility or principal responsibility, and it would not connote an attorney whose contact with the client's file was incidental or technical. The purpose of the ethical requirement animates its meaning. The undoubted purpose is to assure that the conflict of an attorney who had substantial access to the former client's confidences and legal strategies will be imputed to the attorney's new firm, which may not represent an adverse interest in the same or similar matter.

Id. at *5. In deciding that Lorilee and Angelyn had "primary responsibility" the court focused on the fact that Lorilee interviewed CW, Lorilee and Angelyn obtained confidential information, and they developed strategy to represent CW at his detention hearing. Id. at *6. The court also noted CW's defense was a "team approach" which was divided by function. See also Gabapentin, 407 F.2d at 609 (noting that the side-switching attorneys had primary responsibility since they "were fully engaged in and primarily responsible for the pretrial representation of [their former client], and in the course thereof, were privy to confidential attorney work-product and privileged information....")

LG's role in AtlantiCare's defense is much more extensive than

17

the roles Lorilee and Angelyn played in the <u>Pelle</u> case.  Here, LG not only interviewed AtlantiCare's witnesses and communicated with its in-house counsel, but she also prepared motion papers, analyzed relevant documents, prepared discovery responses and helped develop AtlantiCare's defense strategy.  LG was an integral member of AtlantiCare's defense team.

When it decided that the disqualified attorneys had "primary responsibility," the court in <u>Pelle</u> was persuaded by the fact that the attorneys actually obtained confidential information regarding the former client (CW) in the same matter.  The court noted that "a heightened precaution" was necessary in  cases where "the disqualified attorney actually obtained confidential information regarding the former client in the same or similar matter."  <u>Id.</u> at 5.  The court also observed that "[t]he substantial roles performed by Angelyn Gates and Lorilee Gates, including their exposure to confidential information and strategies of defending CW, amount to primary responsibility within the intent of RPC 1.10(c)(1)."  <u>Id.</u> at *6.

Here, the Court finds that LG obtained AtlantiCare's confidential and privileged information.  This is supported by the Declarations of Rosenblatt, Jayachandran and Michael-Ziereis, and is documented in the e-mails the Court reviewed.  LG was an "integral" member of Morgan's defense team.  It therefore cannot be credibly disputed that LG had immediate and easy access to

AtlantiCare's privileged and confidential information.[12]  Based on
the evidence presented, plaintiffs' argument that "Ms. Grosskreutz
[did] not receive any confidential information while employed at
Morgan Lewis" (Supp. Brief at 10) is incredulous.

The Court finds LG had primary responsibility for
AtlantiCare's defense for the same reasons expressed in <u>Pelle</u>:

> The Court ... cannot overlook the cumulative weight
> of the collective responsibilities of the two
> attorneys Gates in representing CW, and the fact
> that actual confidential and tactical information
> was imputed to them during their time as his
> attorneys at Criminal Defense Associates.

<u>Id.</u> at *6.  Similarly, LG's responsibilities at Morgan were
extensive and substantive, and she gained confidential and
privileged information.  The Court finds that LG had a "direct,"
"substantial" and "meaningful" role in AtlantiCare's defense. <u>See</u>
<u>id.</u> at *4, *6.  LG, therefore, had primary responsibility for
AtlantiCare's defense within the meaning of RPC 1.10(c).[13]

Plaintiffs' arguments in opposition to defendants' motion are
unavailing. Defendants argue the Court should accept LG's
characterization of her work as limited because defendants'

_____

[12]Although the receipt of privileged or confidential
information is not a litmus test for primary responsibility, it is
an important relevant factor to consider.  The receipt and exchange
of such information evidences an attorney's substantive work on a
case.

[13]A leading authority in this area infers that primary
responsibility is equated with "policy or operational-level
responsibilities."  Michels, <u>supra</u>, §25:4-3 at 598.  For the
reasons already discussed, LG meets this criteria.

Declarations are biased.[14]  This argument is specious.  The Court
has no reason to question the accuracy of defendants' Declarations.
Further, defendants' Declarations are consistent with LG's e-mails
and time entries.  Indeed, as noted herein, LG's averments, and not
those of the defendants, are questionable.

The Court does not agree with plaintiffs' conclusion that LG
played a minimal and unimportant defense role.  LG's document
reviews, witness interviews, etc. were significant and integrally
related to the defense of the case.[15]  This work is not, as
plaintiffs argue, "mechanical."  Document review, preparing briefs
and interviewing witnesses are all integral to an effective
litigation defense.  Moreover, the Court agrees with defendants
that:

> However much Costello & Mains wish to mistakenly downplay
> [LG's] role, the fact remains that she interviewed multiple
> witnesses and prepared memoranda memorializing those meetings
> in detail.  She prepared pleadings.  She participated with co-

---

[14]Plaintiffs' counsel argued, "I submit to you that she [LG}
doesn't care who ends up representing these plaintiffs, in this
case and she doesn't care whether my firm is disqualified or not.
Morgan, Lewis does, because their clients do."  Transcript ("Tr.")
of September 15, 2011 Oral Argument 17:4-7.

[15]Defendants argue:

Plaintiffs would have the Court believe that Ms. Grosskreutz
was some neophyte junior lawyer playing a bit role sitting in
a library researching case law.  This is absurd.  As Costello
& Mains touted on its website while Ms. Grosskreutz was
employed by it, she is lawyer with 23 years of extensive
experience representing employers, having "devoted her
litigation and trial practice solely to the practice of Labor
and Employment law" and worked for "several large law firms
with offices in New Jersey and nationwide."

Reply Memo. at 6.

counsel in developing strategy. These are not some minor
tasks that a junior lawyer had been asked to perform in
passing because of a shortage of resources.

Reply Memo. at 7.

The Court discounts plaintiffs' argument that even if CM
received information from LG regarding the case, the information
would have been discoverable and not subject to any privilege. See
Opp. Brief at 10 ("LG herself has certified that many of the
documents she reviewed were not relevant to this litigation, and,
further, that none of the documents she reviewed would have been
subject to any claim of privilege."). This argument has been
rejected in various decisions. "Other courts have rejected the
notion that the potential disclosure of confidential information in
discovery could somehow ameliorate a conflict under Rule 1.9." H2O
Plus, LLC v. Arch Pers. Care Prods., L.P., Civ. No. 10-3089 (WJM),
2010 WL 4869096, at *11 (D.N.J. Nov. 23, 2010), aff'd, 2011 WL
1078584 (D.N.J. March 21, 2011)).[16] As the court in H2O Plus noted:

> [A] discovery disclosure based standard governing
> disqualification is illogical and impractical. A
> simple example demonstrates the difficulties with
> such a standard. Say a lawyer adverse to a former
> client files a motion and prevails and the suit
> never reaches discovery. In theory, a lawyer could
> have confidential information from a client and use
> it to craft a motion to dismiss a subsequent
> complaint. If that motion were to be granted, the
> lawyer, operating under a conflict, would have
> successfully avoided disqualification only because
> the lawyer was particularly adept at using
> confidential information to his/her benefit before
> discovery ever commenced . . . . Tying

_____

[16]Although the court in H2O Plus was concerned with Rule
1.9(a), the Court finds the discussion to be applicable to its
analysis of Rule 1.10.

> disqualification to future discovery is simply
> unworkable.  It also does not comport with the
> policies that RPC 1.9 is premised upon.

2010 WL 4869096, at *12.  The Court harbors the same concerns here.

While some of the information LG had access to may be disclosed in

discovery, it is also likely that other materials are privileged

and not subject to production.  The outcome of defendants'

disqualification motion should not be dependent on a document by

document analysis of what is and is not discoverable, otherwise:

> A former client seeking to keep a lawyer from side-switching
> would essentially be required to disclose privileged
> communications simply to maintain a level playing field and
> meet its burden of persuasion on a motion to disqualify.
> Every disqualification motion would have the potential to turn
> into a subdispute over complex privilege issues relating to
> documents and communications-all before the case even started.
> Such a standard would be manifestly unworkable and improper.

Id.  The Court also agrees with defendants' argument that,

"[f]ailure to disqualify Plaintiffs' counsel under these

circumstances would undermine the confidence that clients have in

their outside counsel."  Memo. of Law at 11.

**Screening**

As noted, since LG had "primary responsibility" at Morgan, her

conflict is imputed to CM pursuant to RPC 1.10(c) and defendants'

motion to disqualify must be granted.  However, even if LG did not

have primary responsibility, defendants' motion would still be

granted because plaintiffs cannot satisfy the screening requirement

in RPC 1.10(c)(2).

Pursuant to the 2004 amendments to the RPC's, screening may

cure an imputed conflict in an instance where the disqualified

22

attorney did not have primary responsibility.  RPC 1.10(c)(2) does not give detailed guidance on what needs to be done except to say that the disqualified lawyer must be screened from any participation in the matter and the screening must be timely.  However, RPC 1.10(f) provides some guidance:

> Any law firm that enters a screening arrangement, as provided by this Rule, shall establish appropriate written procedures to insure that: (1) all attorneys and other personnel in the law firm screen the personally disqualified attorney from any participation in the matter, (2) the screened attorney acknowledges the obligation to remain screened and takes action to insure the same, and (3) the screened attorney is apportioned no part of the fee therefrom.

In addition, RPC 1.10 (1) (Terminology) states:

> "Screened" denotes the isolation of a lawyer from any participation in the matter through the timely adoption and enforcement by a law firm of a written procedure pursuant to RPC 1.10(f) which is reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect under these Rules or other law.[17]

Kevin Costello provided the only evidence as to LG's screening.  His Certification states that upon LG's hiring "she was immediately screened from any contact or communication regarding the present matter."  Costello Certification ¶3.  The details of the screening were not included in the Certification.  However, Costello represented at oral argument that LG was told before she started working for him that she was "not going to work on AtlantiCare."  September 15, 2011 Transcript 28:9-11.  Costello

---

[17]The ABA Model Rules do not specifically require a written procedure as does New Jersey.  See MRPC 1.10(k).

represented that the first day LG came to work he told everyone in his office that LG "can't touch this file," "she can't see this file," she "can't go to that file drawer herself," and she can't "click on AtlantiCare" on the "case management system." Id. Tr. 28:9 to 29:6.  Costello also claims he had a reminder meeting with everyone in his office.  Id. 29:6-19.  Costello acknowledges that his firm did not have a written screening policy.

RPC 1.10(f) and 1.0(e) indicate in clear and unmistakable terms that to be adequate a screening procedure must be in writing. CM never established a written procedure and for this reason alone its screening was inadequate.  CM argues its screening was adequate because the RPC's do not provide a time frame for when a written screening procedure must be deployed.  September 15, 2011 Tr. 30:8-10.[18]  Therefore, CM argues, even though it did not have a written screening procedure when LG started at CM, nor at any time during the 6-7 weeks she worked there, CM's screening was adequate.[19]  This argument defies all notions of common sense.  If the purpose of a screening procedure is to protect information the isolated lawyer is required to protect, written procedures should be in place before a disqualified lawyer starts work.  At a minimum, the

---

[18]Costello argued, "[i]t [RPC's] doesn't say that you can't verbally screen and substantively screen and compellingly and finally and well-donely [sic] screen.  And then, by the way, memo it up later and say, by the way, referring back to our meeting on such and such a day, just be reminded, blah, blah, blah."  Id. 30:10-15.

[19]It appears, but it is by no means certain, that CM instituted a written screening policy after LG left the firm.

procedures should be in place when the employment starts, not after the disqualified lawyer leaves the firm.[20]  It makes no sense for the RPC's to require a written screening procedure but to find that the written procedure can be adopted after the disqualified lawyer leaves the firm.  "[T]imely screening arrangements are essential to the avoidance of firm disqualification."  LaSalle Nat'l Bank v. County of Lake, 703 F.2d 252, 259 n.3 (7th Cir. 1983) (emphasis in original).

In addition, even if CM's screening procedure was put in writing, the procedure CM used was inadequate.  Although there is no definitive New Jersey guidance on the elements of an effective screen, the Court has no hesitation in finding CM's procedure inadequate.  There is no indication that the AtlantiCare file was physically separated from CM's other files.  In addition, the file was not specially secured or "kept under lock and key," LG and CM's employees did not acknowledge in writing CM's procedures, and LG was not "locked out" of the AtlantiCare file on CM's computer system.  These are the sorts of procedures that are put in place in instances where courts have found screens to be adequate.  See Opalinski v. Robert Half Int'l Inc., C.A. No. 10-2069 (SDW)(MCA) 2011 WL 1042762 (D.N.J. March 18, 2011);[21] see also LaSalle Nat'l

_____

[20]See MRPC 1.0, Comment 10 ("In order to be effective, screening measures must be implemented as soon as practical after a lawyer or law firm knows or reasonably should know that there is a need for screening.").

[21]In addition to screening, in order for CM to avoid imputation of LG's conflict CM was required to give prompt written notice of

<u>Bank</u>, 703 F.2d at 259;[22] <u>Holcombe v. Quest Diagnostics</u>, 675 F. Supp.
2d 515, 519 (E.D. Pa. 2009); <u>State Bar of Nevada Standing Committee
on Ethics and Professional Responsibility</u>, Formal Opinion No. 39
(April 24, 2008).[23]

**RPC 1.10(b)**

LG left CM on April 15, 2011, which is the same day defendants
filed the present motion.  Plaintiffs argue that because LG left
CM, the present motion should be governed by RPC 1.10(b).  Pursuant
to this subsection of the Rule:

---

LG's employment to defendants.  The purpose of the notice is to
enable defendants to ensure compliance with the RPC's.  <u>See</u> RPC
1.10(c)(3).  CM did not give this notice.  Instead, Morgan first
learned about LG's side-switching when it saw her name on CM's
letterhead.  This apparently occurred shortly after LG joined the
firm.  The appropriate course of conduct should have been for CM to
notify Morgan before LG started at the firm.  This would have
enabled defendants to "ascertain compliance" with RPC 1.10(c)
sooner rather than later.  Although defendants did not have the
right to "veto" LG's employment, prompt written notice is
undoubtedly contemplated by RPC 1.10(c)(3).  If CM had time to
employ LG and add her name to its letterhead, it certainly had the
opportunity to notify defendants of LG's employment before she
started at the firm or contemporaneously therewith.  Despite CM's
actions in this regard, however, the Court does not base CM's
disqualification on its failure to give proper  notice pursuant to
RPC 1.10(c)(2).

[22]Noting that the common characteristics of an approved
screening arrangement include, <u>inter alia</u>, denial of access to
relevant files, discussion of the suit was prohibited in her
presence, no members of the firm could show her documents relating
to the case, files were kept in a locked file cabinet, and an
affirmation under oath that the disqualified attorney and others
affirmed these facts.

[23]Noting that the elements of an effective screen include,
<u>inter alia</u>, the isolation of files and electronic communications
from the personally disqualified lawyer, periodic written notices
for as long as the screen is necessary, and affirmations that the
screen has not been breached.

> When a lawyer has terminated an association with a
> firm, the firm is not prohibited from thereafter
> representing a person with interests materially
> adverse to those of a client represented by the
> formerly associated lawyer and not currently
> represented by the firm, unless: (1) the matter is
> the same or substantially related to that in which
> the formerly associated lawyer represented the
> client; and (2) any lawyer remaining in the firm
> has information protected by RPC 1.6 and RPC 1.9(c)
> that is material to the matter.[24]

Defendants argue that severing a relationship with a disqualified attorney does not cure imputed disqualification. See Reply Memo. at 10 (citing Lawler v. Isaac, 249 N.J.Super. 11 (App. Div. 1991)). Defendants also argue that "even if RPC 1.10(b) were to somehow control now that [LG] is no longer associated with [CM], both elements of the rule can easily be established so that [LG's] conflict must still be imputed to [CM]." Id. at 11.

This issue was addressed in Pravak v. The Meyer Eye Grp., PLC, No. 07-2433-JPM-dkv, 2008 WL 4372914 (W.D. Tenn. Sept. 19, 2008). In Pravak, the court found that a disqualified attorney could not "cure" imputed disqualification by terminating his employment with the firm. The decision noted:

> [I]f a lawyer was allowed to 'cure' an imputed
> disqualification by simply leaving his current firm, that
> lawyer would be able to undertake representation of a
> client adverse to a partner's former client, appropriate
> confidential information about the former client to aid
> his current client, and use that information to the
> detriment of the former client by simply leaving his
> current firm and opening an office across the street.
> This is not the type of conduct considered acceptable

---

[24]As aptly put in another opinion, CM urges the Court to adopt a rule whereby the imputed disqualification of a "tainted" lawyer "evaporates" upon the departure of the side-switching attorney. Cardona, supra, 942 F. Supp. at 976.

under the TRPC.

Id. at *8.  This Court agrees, and finds further support for this conclusion in Cardona, 942 F. Supp. at 976, wherein the court found that a rule permitting the cleansing of an imputed conflict by the mere dismissal of a side-switching attorney "would not provide any disincentive to a law firm that contemplates hiring an attorney who has formerly represented an adverse party."   Accord Lawler v. Isaac, 249 N.J. Super. 11, 17 (App. Div. 1991)("The firm must be disqualified even if the associate disclosed none of his previously acquired knowledge and even though he is no longer employed by [the firm.]").

For the reasons discussed, therefore, the Court finds that RPC 1.10(b) is not applicable to the conflict imputation issue before it.

**Conclusion**

In sum, the Court finds that Costello and Mains must be disqualified because LG's conflict is imputed to the entire firm. Since LG had "primary responsibility" for AtlantiCare's defense while she worked at Morgan, screening cannot prevent the conflict imputation.  In addition, even if LG did not have primary responsibility, disqualification is appropriate because CM did not employ an adequate screening procedure.

Accordingly, for all the foregoing reasons, defendants' "Motion to Disqualify Plaintiffs' Counsel Costello & Mains, P.C." [Doc. No. 18] is GRANTED.  An appropriate Order will be entered.


                                    s/Joel Schneider
                                    JOEL SCHNEIDER
                                    United States Magistrate Judge

Dated: October 25, 2011